IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-cv-00557-WYD-KLM

RUSSELL MARSHALL BOLES,

     Plaintiff,

v.

GARY D. NEET,

     Defendant.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
AND ORDER ON PLAINTIFF'S MOTIONS #289 & #291**

---

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on **Defendant's Combined Motion for Summary Judgment and Memorandum Brief in Support of Motion for Summary Judgment** [Docket No. 277; Filed November 3, 2008] ("Motion for Summary Judgment"). Plaintiff filed a Response on November 17, 2008 [Docket No. 107], but Defendant did not file a reply. Pursuant to 28 U.S.C. § 636(b)(1) and D.C. Colo. L. Civ. R. 72.1(C)(3), the Motion for Summary Judgment has been referred to this Court for recommendation. The Court has reviewed the parties' pleadings, the entire case file, and the applicable case law and is sufficiently advised in the premises.

     For the reasons set forth below, the Court RECOMMENDS that the **Motion for Summary Judgment** [#277] be **GRANTED**.

**I. Statement of Facts**

     Unless otherwise noted, the relevant facts are taken from the facts set forth by the United States Court of Appeals for the Tenth Circuit in a previous appeal of this matter.

*Boles v. Neet*, 486 F.3d 1177 (10th Cir. 2007). Plaintiff is an Orthodox Jew incarcerated by the Colorado Department of Corrections ("CDOC") at the Fremont Correctional Facility ("FCF") in Canon City, Colorado. He filed a lawsuit pursuant to 42 U.S.C. § 1983 alleging that his First Amendment rights were violated when Defendant denied his request to wear religious garments outside the prison facility. At the time of the incident, Defendant was the warden of FCF.

Specifically, in March 2001, Plaintiff was scheduled to be transported to an offsite hospital to receive cataract surgery. On the date of his surgery, prison officials told Plaintiff that he would have to remove his religious garments, including his yarmulke and tallit katan,[1] prior to the transfer. Plaintiff refused to comply and, consequently, prison officials did not transport him to the hospital. Defendant informed Plaintiff that a prison regulation prohibited him from wearing any religious garb during offsite transport. Defendant cited to AR 300-37-RD which prescribed that during off-site transport, inmates "are [to be] transported in orange jumpsuits and transport shoes" [Docket No. 277-5]. The transport regulation did not specifically prohibit an inmate from wearing other garments in addition to an orange jumpsuit, but it also did not specifically make an exception for the wearing of religious clothes. Via a different regulation, the prison policy has since been amended to allow inmates to wear certain religious clothing during transport, including the clothing at issue here [Docket No. 2778-8 at 8].[2] *Affidavit of Gary Neet* [#277-4] at 5. Defendant avers

---

[1] A "yarmulke" is a head covering and a "tallit katan" is a fringed undergarment worn on the upper body.

[2] After amendment of the policy, Plaintiff was transported to an offsite hospital and received successful cataract surgery. Following the surgery, Plaintiff's vision was restored to 20/20 [Docket No. 277-9].

that this amendment has increased the amount of time it takes to ready an inmate for offsite transport to ensure that he does not have hidden contraband designed to facilitate escape. *Affidavit of Gary Golder* [#277-6] at 5.

Another prison regulation in place in March 2001 detailed the conditions under which inmates were allowed to wear religious garments [Docket No. 277-3]. While AR 800-01 Attachment E authorized an inmate to wear a tallit katan at all times, Defendant avers that "construing [the 2001 religious clothing and transport] regulations together, it was apparent that inmates were not allowed to wear religious items while being transported." *See Affidavit of Gary Neet* [#277-4] at 2. Further, the regulation related to religious garments prohibited the wearing of yarmulkes except in an inmate's cell or in a Jewish religious service [Docket No. 277-3 at 18].

## II. Procedural Background

This is the second motion for summary judgment filed by Defendant. The first was filed at the outset of the case and prior to the completion of discovery. It was granted in part and denied in part on November 30, 2005 [Docket No. 172]. The District Judge assigned to the matter at the time of the first motion's briefing found that "at this stage of the case, this Court cannot say as a matter of law that Defendant Neet's determination to prohibit the wearing of such items during transport was a reasonable restriction on plaintiff's free exercise of his religious practices, consistent with prison security needs, such that he is entitled to be clothed with qualified immunity." *Order* [#172] at 12.

Defendant appealed the denial of summary judgment on the issue of qualified immunity to the Tenth Circuit. On May 24, 2007, the Tenth Circuit affirmed the District Judge's decision [Docket No. 227]. *Boles*, 486 F.3d at 1184. In so doing, the Tenth Circuit

noted that Defendant's actions may have been motivated by a legitimate penological concern, but that the record before the Court did not support that finding. As such, the Court found that disputes remained as to whether Defendant violated Plaintiff's constitutional right. *Id.* The Tenth Circuit also found that in order to show that the constitutional right was not clearly established because of Defendant's reliance on a prison regulation, that regulation must first be shown to be "reasonably related to legitimate penological interests." *Id.* The Tenth Circuit further noted that the basis for the regulation at issue was not inherently clear. On remand, "[i]f its purpose is [shown to be] to easily identify escaped convicts and prohibit them from moving quickly on foot, reading into the regulation a prohibition against yarmulkes and religious undergarments makes no sense. On the other hand, if the purpose is preventing the smuggling of contraband, the implicit prohibition against wearing religious garments may make sense. Warden Neet failed to make a showing either way." *Id.* at 1184 n. 6. The Court specifically "recognize[d] that Warden Neet may adduce additional facts in support of a later summary judgment motion . . . " to support his contention that he had a "valid penological justification" for his conduct in relying on the prison regulation in effect at the time. *Id.* at 1183-84.

On remand, counsel representing Plaintiff moved to set a scheduling conference and case deadlines [Docket No. 233].[3] The Court granted the motion and set new case deadlines. The dispositive motions deadline was set for November 3, 2009 [Docket No. 272]. Defendant timely filed the Motion for Summary Judgment at issue here supported

---

[3] Prior to filing of the Motion for Summary Judgment, counsel for Plaintiff had been given leave to withdraw due to an irreconcilable conflict [Docket No. 272]. As such, Plaintiff is proceeding *pro se*.

by affidavits and other documents [Docket No. 277]. Plaintiff responded in opposition to the Motion for Summary Judgment. Other than his Response, which was sworn under penalty of perjury, he did not attach any supporting documentation [Docket No. 281].

Defendant argues that he is entitled to qualified immunity because Plaintiff cannot show a violation of a constitutional right and because there was no clearly established law that required Defendant to allow Plaintiff to wear religious attire while being transported. *Motion for Summary Judgment* [#277] at 11-19. Defendant also argues that Plaintiff's claim for compensatory damages is barred by the Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e(e).

Plaintiff raises several procedural challenges to Defendant's Motion for Summary Judgment. First, he contends that the Motion was untimely, and is subject to denial on this basis alone. *Response* [#281] at 1. Second, he contends that because Defendant already litigated whether he was entitled to qualified immunity, the Motion is redundant and improper. *Id.* While Plaintiff fails to address with specificity many of the purported undisputed facts set forth in Defendant's Motion, he generally alleges that "defendant and his cronies have a particular bent toward prejudice and descrimination [sic] toward jews and anyone who shaves their head." *Id.* at 2. Lastly, Plaintiff alleges that "[t]he affidavits presented by defense are inaccurate" and that the Court should reject them because they "are not signed under penalty of perjury." *Id.* at 2-3.

Because many of Plaintiff's challenges are frivolous, I resolve them here without analysis. First, Plaintiff incorrectly states that the Motion for Summary Judgment is not timely. The Motion was filed on the date of the dispositive motions deadline and is

therefore timely [Docket No. 272].  Second, Plaintiff's counsel specifically requested that a scheduling conference be held to set new case deadlines, and Plaintiff submitted a joint proposed scheduling order which included proposed discovery and dispositive motions deadlines [Docket No. 257].  Therefore, Plaintiff has waived any challenge regarding whether the Motion for Summary Judgment is procedurally redundant.  More importantly, the defense of qualified immunity may be raised more than once in the course of a case. *See, e.g.*, *Prager v. LaFaver*, 180 F.3d 1185, 1192 n.6 (10th Cir. 1999) (noting that defendant is free to raise the defense of qualified immunity a second time on a better developed record).  Further, I note that the Tenth Circuit specifically contemplated that Defendant would reassert his arguments regarding qualified immunity in a renewed motion for summary judgment following the completion of discovery.  *See Boles*, 486 F.3d at 1183.  Third, Defendant's supporting affidavits, while not signed under penalty of perjury, were made on the basis of personal knowledge by individuals competent to testify and were sworn and notarized.  Therefore, they are valid for purposes of Fed. R. Civ. P. 56(e)(1).  To the extent that Plaintiff raises substantive challenges to the Motion for Summary Judgment, I address the merits of those challenges below.

### III.  Standard of Review

The purpose of a summary judgment motion is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Fed. R. Civ. P. 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine

if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit pursuant to the governing substantive law. *Id.*

The movant must show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. After the movant has met his initial burden, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to the nonmovant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Further, the nonmoving party's affidavit or evidence must be more than "mere reargument of a party's case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed. 1998).

Finally, the Court must construe the filings of a *pro se* litigant liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). For example, the Court may treat a *pro se* litigant's Response as an affidavit if it alleges facts based on personal knowledge and has been sworn under penalty of perjury. *See Hall*, 935 F.2d at 1111 (citing *Jaxon v. Circle K Corp.*, 773 F.2d 1138, 1139 n.1 (10th Cir. 1985) (citation omitted)). However, the Court should not be the *pro se* litigant's advocate, nor should the Court "supply additional factual allegations to round out [the *pro se* litigant's] complaint or construct a legal theory on [his or her] behalf." *Whitney v. State of New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, *pro se* litigants must follow the same procedural rules that govern other litigants. *See Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

## IV. Analysis

Defendant asserts that he is entitled to qualified immunity with regard to Plaintiff's remaining First Amendment claim. *Motion for Summary Judgment* [#277] at 9-10. Qualified immunity, in certain circumstances, protects government officials from litigation when they are sued in their individual capacities. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 814–18 (1982). "[G]overnment officials . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. Defendant argues first that Plaintiff has not sufficiently alleged the violation of a constitutional right with regard to his First Amendment claim, and second, that there was no relevant precedent at the time of the alleged violation that clearly established a violation for requiring inmates to remove religious garb prior to transport. *Motion for Summary*

8

*Judgment* [#277] at 11-19.

When a defendant asserts a qualified immunity defense in a summary judgment motion, the burden first falls to the plaintiff to make a two-pronged showing that qualified immunity is inapplicable. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). Plaintiff must first establish that the named Defendant violated a constitutional right. *Id.* Plaintiff must then establish that the right was clearly established at the time of the violation. *Id.* The second part of the test is only implicated if Plaintiff has satisfied the first part. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina*, 252 F.3d at 1128 (citing *Albright*, 51 F.3d at 1535).

Here, Defendant asserts that he is entitled to qualified immunity as to Plaintiff's allegation that not allowing him to be transported while wearing religious garments violated his First Amendment rights. As such, Plaintiff bears the initial burden to establish "that [D]efendant[s'] actions violated a constitutional or statutory right." *Albright*, 51 F.3d at 1534. "To meet his burden at this stage, [Plaintiff] ha[s] to show that Warden Neet's conduct substantially burdened his sincerely-held religious beliefs." *Boles*, 486 F.3d at 1182 (citing *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). The Tenth Circuit has already determined that Plaintiff's complaint clearly articulated the religious importance of observing the requirement for wearing a yarmulke and tallit katan, *id.*, and Defendant concedes the point for purposes of resolution of the present Motion for Summary Judgment. *Motion for Summary Judgment* [#277] at 12. Therefore, Defendant is tasked with "'the relatively limited burden of identifying the legitimate penological interests that justif[ied] the impinging

conduct.'" *Boles*, 486 F.3d at 1182 (quoting *Salahuddin*, 467 F.3d at 275).

Because Defendant identifies the prison regulation regarding offsite transport of prisoners which he contends justified his conduct, a reasonableness test applies. Specifically, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). To this end, the Court applies four factors:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the rights are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-91). Defendant contends that his conduct was justified not only by the regulation, but also by the goal of preventing escapes and assaults during transport generally. *Affidavit of Gary Neet* [#227-4] at 4-5. The *Turner* balancing test is applied to determine the reasonableness of Defendant's conduct in the face of the impact on Plaintiff's First Amendment rights. *Boles*, 486 F.3d at 1181 & n.4.

**Rational Connection to Legitimate Governmental Interest**

Defendant argues that both the regulation and his interpretation that it prohibited inmates from wearing religious garb during transport were rationally connected to the legitimate interest of preventing escape and assaults during offsite transport of an inmate. On appeal of the first motion for summary judgment, the Tenth Circuit concluded that it could not evaluate this factor on the basis of the material contained in the record. Specifically, it noted that the parties did not include an unredacted version of the regulation

10

at issue nor had they supplied the court with any evidence that Defendant's conduct or the policy was motivated out of a legitimate fear that inmates could use garments other than orange jumpsuits "to smuggle contraband into and out of the prison." *Id.* at 1183.

For purposes of the present dispositive motion, the Court again was only provided a small portion of the regulation at issue (presumably due to security concerns). As noted earlier, on its face, the regulation does not contain a prohibition against wearing religious garments in transport, but neither does it contain an exception for wearing religious garments. However, the regulation was supplemented by affidavits from Defendant and the CDOC Director of Prisons regarding the dangers faced by prison officials, inmates, and the public at large during prisoner transport.

Specifically, the affidavits set forth the various concerns associated with transporting prisoners, including the potential for escape and assaults.

> Because of the serious security threat that arises when transporting inmates, inmates are allowed minimal, if any, property; are required to be in full restraints; must wear an[] easily identifiable and distinguishable orange jumpsuit, must have a minimum of two staff escorts; and depending on custody level, may require an armed escort vehicle. . . .
>
> Any deviation from such a policy, however benign it may appear, simply increases what is already an extremely dangerous situation. In the event an inmate had an additional shirt, he could remove the orange jumpsuit and be more difficult to identify during escape. In addition, the orange jumpsuit and transport shoes issued to the inmate are provided immediately prior to transport. Allowing an inmate to wear clothing that the inmate has been in possession of in his cell to the transport permits the inmate to hide contraband, for example, a handcuff key or item such as a paperclip fashioned into a cuff key, a small razor or other weapon sewn into or hidden in any clothing item the inmate had possession of for a length of time prior to the transport . . . .

*Affidavit of Gary Golder* [#277-6] at 3-4. Defendant avers that the purpose of the regulation was to alleviate these grave security concerns, which only arise during offsite transport of

an inmate. *Affidavit of Gary Neet* [#277-4] at 2-5.

In Plaintiff's verified Response to the Motion for Summary Judgment, he does not specifically dispute any of these contentions, but only generally argues that the "affidavits appear coached and unfounded." *Response* [#281] at 2. Such a contention, which is based on mere speculation, does not raise a legitimate dispute as to the purpose of the regulation advanced by Defendant. Therefore, I find that Defendant's stated purpose of the regulation – namely that the regulation existed to prevent escape and assaults during transport – is undisputed.

Whether the prohibition against wearing religious garments in transport was rationally connected to the purpose of the regulation or to preventing escape or assault during transport generally is the remaining question. "The first factor [of the reasonableness test] is 'foremost in the sense that a rational connection is a threshold requirement . . . ." *Sutton v. Rasheed*, 323 F.3d 236, 253 (3d Cir. 2003) (citation omitted). To move on to the remaining three factors, "the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals." *Beerheide*, 286 F.3d at 1186.

The only responsive argument made by Plaintiff in relation to whether there was a rational basis for Defendant's conduct is that "[t]here is an irony in that prisoners are allowed to wear their own personal underwear in transit (personal garments)." *Response* [#281] at 2. Viewing his verified Response liberally, the Court interprets Plaintiff's argument to be that if the prohibition against wearing religious garments during transport was rationally related to the purpose of the regulation or to prevention of escape and assault generally, then prisoners should likewise have been required to remove their underwear

12

during transport.

However, preventing the smuggling of contraband is not the only basis Defendant provided for the decision to disallow religious clothing in transport. Defendant also avers that the prohibition is related to decreasing the possibility that in an escape, an inmate could remove his orange jumpsuit and more easily blend in with others around him. *Affidavit of Gary Neet* [#277-4] at 3-4; *Affidavit of Gary Golder* [#277-6] at 2-3. For instance, if an inmate were allowed to wear a shirt under his orange jumpsuit, such as a tallit katan, he could remove or lower the jumpsuit to make it more difficult to identify him. The same possibility is not inherent in allowing a prisoner to wear his underwear in transport.

To satisfy his burden here, Defendant need only show that his conduct was rationally connected to "the legitimate government interest put forward to justify it." *Turner*, 482 U.S. at 89. In this regard, Courts are to give "substantial deference . . . to the prison authorities." *Frazier v. Dubois*, 922 F.2d 560, 562 (10th Cir. 1990). Here, Defendant argues both that the policy behind the regulation and the desire to prevent escape or assault during transport generally are rationally connected to a prohibition against prisoners wearing personal items during transport, including religious garments.

I find that Defendant has provided a "valid, rational connection" between the prohibition against wearing religious garments during transport, the goal of the regulation, and the prevention of escape and assault during transport generally. The concerns raised by Defendant to justify his conduct are not speculative, but are based on past incidents where inmates have attempted to hide contraband in their clothing to enable escape or the assault of other officers and inmates during transport. *See Affidavit of Gary Golder* [#277-

6] at 4. In addition, Defendant also cites the valid goal of protecting the inmate as a basis for his conduct. For instance, other nonreligious inmates, or inmates who hold beliefs particularly at odds with a Jewish inmate, would be more easily able to identify a Jewish inmate wearing a yarmulke while in transport, which could lead to contemporaneous or subsequent violence. *Affidavit of Gary Neet* [#277-4] at 3-4. "This creates serious security concerns because of the limited staff and resources available to quell such problems during transport." *Id.* at 5.[4] Presumably, the prevention of inmate assault is also one of the reasons why CDOC prisoners are not allowed to wear yarmulkes in the public areas of the prison and are limited to wearing them in their cells or at religious services only [Docket No. 277-3 at 18].

While Plaintiff contends that the Court should "take inferences" from Defendant's supporting affidavits that Defendant "and his cronies have a particular bent toward prejudice . . . against Jews," I find no support for this conclusory statement. *See Response* [#281] at 2. Nothing in the record demonstrates or suggests that the regulation was only applied to Jewish inmates. Because I find that Defendant's prohibition was rationally connected to a legitimate government interest and that there is no evidence that it was applied in a discriminatory manner, Defendant has met his minimal burden as to this threshold factor.

### Alternative Means to Exercise the Inmate's First Amendment Right

------

[4] In his Response, Plaintiff appears to contend that Defendant could not be reasonably concerned for a Jewish inmate's safety because Plaintiff has been put in the same cell as inmates with anti-Jewish beliefs. *Response* [#281] at 2. This conclusory statement, on its own, does not dispute Defendant's contention that in transport and thereafter, the concern regarding an assault on a Jewish inmate, is heightened.

Pursuant to AR 800-01 Attachment E, while incarcerated, an inmate is allowed to wear a yarmulke in his cell and during religious services and is allowed to wear a tallit katan at all times [Docket No. 277-3 at 18].[5]  While Defendant did not interpret this regulation to impact the attire a prisoner was allowed to wear during transport, it is clear that for the majority of the time an inmate is incarcerated, he is permitted to wear religious attire.  As a result, Defendant's prohibition against religious attire worn during transport did not completely deprive an inmate of opportunities to exercise his faith.

Arguably, however, the absolute prohibition against wearing religious attire, even for a short time, may be reasonably interpreted to leave no alternative methods for an inmate to exercise his faith.  *See Makin v. CDOC*, 183 F.3d 1205, 1213 (10th Cir. 1999) (recognizing that there is a difference between the mere diminishment of exercise and the complete denial); *Clifton v. Craig*, 924 F.2d 182, 183-84 (10th Cir. 1991) (noting that as long as some alternative means exist, religious exercise can be said to be available).  For instance, the Tenth Circuit recognized that a code of Jewish law forbids a follower from walking "a distance of four cubits (between 12 and 16 feet) during daylight hours with his head uncovered and not wearing a [tallit katan]."  *Boles*, 486 F.3d at 1179 n.2.  As such, even walking a short distance without a head covering or tallit katan is a significant deprivation that cannot necessarily be remedied by allowing a prisoner access to those items at other times or locations.  While Defendant cites to a change in the regulation to specifically make an exception for wearing religious garb while in transport, this provision was not in place at the time of the conduct at issue here and is irrelevant to the

_____

[5] When not in a cell or religious service, Jewish inmates are allowed to wear a prison-approved hat as a head covering instead of a yarmulke [Docket No. 277-3 at 18].

determination of whether Plaintiff had adequate alternative methods to exercise his faith at the time of Defendant's conduct. On balance, in the absence of any further evidence of alternative means available to Plaintiff, I find that this factor weighs in favor of Plaintiff.

**Impact of Accommodation on Government and Others**

Here, Defendant argues that at the time of the incident, allowing Plaintiff to wear his religious clothes would have had a negative impact on prison guards, other inmates, and the public in general because the guards were not trained to take the additional time necessary to search an inmate's religious clothing prior to transport. Since the regulation has been amended to allow Jewish inmates to wear religious clothing, additional training was required and it now takes additional, scarce resources to effect a transfer of a Jewish inmate. Moreover, when an inmate is wearing additional clothing, the risk of escape or assault is heightened, which impacts the guards, other inmates in transport, and the members of the public they meet along the way. Plaintiff does not dispute that the change in policy has a negative ripple effect on the time, expense, and safety concerns associated with transporting a Jewish inmate. *See Wares v. Simmons*, 524 F. Supp. 2d 1313, 1324-25 (D. Kan. 2007) (noting that it is plaintiff's burden to dispute defendants' contentions regarding the rationality or justifications of their conduct).

Although not the case at the time of the incident at issue here, it appears that Defendant and the CDOC have now accepted the reality that there will be additional risks associated with allowing inmates to wear religious clothing in transport but that those risks are necessary to afford inmates the opportunity to exercise their constitutional rights. I find that the increased risk of inmate escape or assault during transport of a Jewish inmate is a clearly-articulated negative impact of the accommodation on Defendant and others.

16

While the fact that the CDOC appears to be successfully carrying out this change in procedure tends to undermine the significance of its claimed negative impact, e.g., it is unclear how the prison prevents inmate assaults between rival members of religious sects now that a Jewish inmate is easily identifiable in transport, I find that this factor weighs slightly in favor of Defendant.

### Existence of Obvious Alternatives

This factor concerns whether Defendant's response to the security concern was exaggerated given the existence of "obvious, easy alternatives . . . to fully accommodate the prisoner's rights at *de minimus* cost." *Turner*, 482 U.S. at 90-91; *Thornburgh v. Abbot*, 490 U.S. 401, 418 (1989). Defendant need not show that the regulation or his conduct represented the least restrictive means at the time. *See Thornburgh*, 490 U.S. at 411; *see also Beerheide*, 286 F.3d at 1192 (emphasizing that "this is not a least restrictive test. Prison officials need not demonstrate they have considered or tried all other methods of dealing with the issue before courts will be satisfied with the prison's resolution"). Rather, Defendant runs afoul of this factor if his response was unreasonably harsh given the existence of other obvious options. "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably found fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' . . . . Furthermore, the administrative inconvenience of this proposed alternative is also a factor to be considered and adds additional support to the . . . conclusion that [prison officials] were not obligated to adopt it." *Thornburgh*, 490 U.S. at 419.

In this case, Defendant determined that his conduct was required, in part, by the

regulation associated with the transport of inmates. Pursuant to this reasonable interpretation, Defendant avers that it was incumbent upon him to strictly enforce the prohibition. Indeed, "CDOC continually emphasizes that wardens are to comply with CDOC policy and cannot substitute their own personal policies for Department policy." *Affidavit of Gary Golder* [#277-6] at 4. Given this strong mandate, Defendant endeavored to enforce the regulation to carry out its purpose, but also sought guidance from CDOC executive staff about whether an accommodation for Jewish inmates was in order. "These inquiries sparked meetings of executive staff and related personnel which resulted in amending AR 800-01 on November 15, 2001 to allow Jewish inmates to wear their Yarmulke and Tallit Katan during transport." *Affidavit of Gary Neet* [#277-4] at 5. This process took approximately eight months to effect.

While it was ultimately determined that there were methods that could be employed to lessen the impact on Plaintiff's First Amendment rights, I find that at the time, Defendant's response was not exaggerated. *See generally Prison Legal News v. Cheshire*, No. 1:04-cv-173DAK, 2006 WL 1868307, at *8 (D. Utah June 30, 2006) (unpublished decision) (holding that the fact that other nearby prisons were already successfully employing a less restrictive alternative "does not automatically demonstrate that [Defendant's conduct was] an exaggerated response"). Indeed, it appears that CDOC executives agreed with Plaintiff's interpretation of the transport regulation as applied to Plaintiff, given that another regulation was eventually amended specifically to allow Jewish inmates to wear religious garments during transport. If Defendant's conduct was not mandated by the policy, there would have been no need to issue an amendment to effect a change in procedure. Further, I note that during the amendment process, Plaintiff

18

refused to remove his religions garments and was not permitted offsite. As such, his cataract surgery was put on hold. This history suggests that given the bureaucracy involved, and Defendant's inability to deviate from CDOC policy without clear guidance, at the time of the incident, there were no "obvious, easy alternatives."

Defendant also determined that his conduct was justified, in part, on the desire to prevent escape and assault during transport generally. I have already found that Defendant's fear that the risk of escape and assault was heightened during transport of an inmate wearing additional clothing besides an orange jumpsuit was reasonable. As such, given that Defendant rejected a less restrictive alternative, i.e., allowing inmates to wear personal clothing in addition to their orange jumpsuits, on the basis of these reasonably founded fears, he has "succeed[ed] in demonstrating that the alternative [he] in fact selected was not an 'exaggerated response.'" *Thornburgh*, 490 U.S. at 419.

Moreover, I note that the change did not come at a *de minimus* cost. It requires additional training of prison guards and increases the amount of time it takes to ready a Jewish inmate for transport which, consequently, also increases the financial cost associated with prisoner transport. *See Affidavit of Gary Golder* [#277-6] at 5. Such a change also comes at a cost to the prison's level of assurance that Jewish inmates are safe from assault during or after transport.[6] Plaintiff does not dispute Defendant's claimed financial impact due to the policy change or that it is now more dangerous to transport a

---

[6] Arguably, the fact that the CDOC voluntarily amended its regulations to change the transport policy relating to religious clothing suggests that there were other obvious alternatives that could have been employed. However, Defendant has demonstrated that the change did not come at *de minimus* cost. The fact that the CDOC ultimately chose to bear that additional cost is not determinative of whether, at the time of the incident, Defendant's actions were reasonable.

Jewish inmate.  I find that this factor weighs in favor of Defendant.

Although not every *Turner* factor falls squarely in Defendant's favor, as recognized by the Tenth Circuit, Defendant's burden here is "relatively limited."  *Boles*, 486 F.3d at 1182.  Moreover, I "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  On balance, my analysis of the *Turner* factors reveals that the regulation and Defendant's ensuing conduct were reasonably related to a legitimate penological interest.  As such, Plaintiff has failed to satisfy his initial burden to show that Defendant violated a constitutional right.  This failure automatically entitles Defendant to qualified immunity.  *See Medina*, 252 F.3d at 1128 (citing *Albright*, 51 F.3d at 1534).

Even were the Court to find that Plaintiff sufficiently established a constitutional injury, I find that Defendant would nevertheless be entitled to qualified immunity.  In this regard, Plaintiff bears the burden of proving that Defendant's actions violated clearly established law.  *Guffey v. Wyatt*, 18 F.3d 869, 871 (10th Cir. 1994).  *See generally Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("[W]hether the right was clearly established . . . must be undertaken in light of the specific context of the case, not as a broad general proposition.").  It is not enough to argue that the law clearly establishes that the First Amendment protects religious expression.[7]  *See id.*  "Rather, . . . 'the right the official is alleged to have violated

---

[7] Although Plaintiff fails to raise this argument, I note that in adjudication of the first motion for summary judgment, Plaintiff argued that the question should be whether it was clearly established that Plaintiff retains his First Amendment right of religious freedom.  However, I find that this framing of the question is too broad.  There is no dispute that Plaintiff

must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.'" *Id.* at 202 (citation omitted).

Here, Defendant contends, in part, that his actions were justified by the prison regulation in effect at the time. Reliance on a prison regulation does not necessarily save the day for Defendant. As the Tenth Circuit noted, it is "clearly established [by] *Turner* that prison regulations cannot arbitrarily and capriciously impinge on inmates' constitutional rights. To be valid, a regulation must be reasonably related to legitimate penological interests. Therefore, Warden Neet's actions were reasonable and he is entitled to qualified immunity only if the regulation that he relied on was reasonably related to a legitimate penological interest." *Boles*, 486 F.3d at 1184. *But see Rachamin*, 147 Fed. Appx. at 734-35 (holding that even though prison policy unreasonably infringed on prisoners' religious rights, defendants were entitled to qualified immunity). Here, I have found that the regulation was reasonably related to a legitimate safety interest.

While a contrary finding, i.e., the regulation is patently unreasonable, may not entitle Defendant to qualified immunity, see *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1252 n.30 (10th Cir. 2003)*,* Defendant also contends that his conduct was justified on the basis of general security concerns. Here, I have also found that these concerns were reasonably related to Defendant's conduct. However, even if I had found that Defendant's conduct

---

has a right to exercise his faith, however, that right is not unlimited and does not foreclose the protection of qualified immunity. *See generally Rachamim v. Ortiz*, 147 Fed. Appx. 731, 735 (10th Cir. Aug. 31, 2005) (unpublished decision). To be sure, considering that prisoners are not allowed to wear yarmulkes outside their cells unless attending a religious service [Docket No. 277-3 at 18], and this limitation is not in question, it is clear that some restriction on religious apparel is permitted despite Plaintiff's First Amendment right.

was not sufficiently justified by a valid security objective, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct. . . .  If the officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.  After all, "qualified immunity precludes the imposition of liability for 'all but the *plainly incompetent* or those who knowingly violate the law.'" *Roska*, 328 F.3d at 1251 (citation omitted).

Considering that the burden rests with Plaintiff, I find that he has not shown that the law was clearly established that the prohibition against inmates wearing religious garb during transport amounted to a constitutional violation.  In particular, Plaintiff does not argue nor does he show that "analogous Supreme Court or Tenth Circuit decision[s] support[] his view, or clearly established weight of authority from other courts" prevents the application of qualified immunity.  *Wares*, 524 F. Supp. 2d at 1325.  At the time of the incident, the law in this Circuit did not definitively speak to the question of whether requiring the removal of certain religious clothing or symbols in response to a valid security interest violates a prisoner's constitutional rights, except to clearly convey to prison officials that "[a] prisoner's right to exercise his religion is not absolute."  *Hall v. Maynard*, 989 F.2d 507 (table) (10th Cir. 1993) (citing *Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991)).

Although not controlling, a sister court from this Circuit has held that requiring inmates to remove their religious headgear on their way to religious services was a "reasonable means of accomplishing [the] legitimate penological interests" of preventing inmates from concealing contraband or displaying gang membership.  *Sledge v. Cummings*, 995 F. Supp. 1276, 1281 (D. Kan. 1998).  Moreover, a cursory review of caselaw in other Circuits suggests that constitutional challenges regarding restrictions on

religious clothing or symbols in the prison setting have been consistently rejected either on the basis of the rationality of the policy or the application of qualified immunity. *See, e.g.*, *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997); *Young v. Lane*, 922 F.2d 370, 375-77 (7th Cir. 1991); *Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir. 1987); *see also Burgin v. Henderson*, 536 F.2d 501, 504 (2d Cir. 1976) (noting that legitimate security concerns could justify the prison's requirement that prayer hat be removed). Therefore, I find that Plaintiff has failed to satisfy his burden to show that it was clearly established at the time of Defendant's conduct that he was committing a constitutional violation.

Accordingly, I recommend that Defendant's conduct be protected by the doctrine of qualified immunity, and Plaintiff's remaining First Amendment claim be dismissed.

### V. Conclusion

As set forth above, the Court **RECOMMENDS** that the **Motion for Summary Judgment** [#277] be **GRANTED**, and that Plaintiff's case be dismissed.[8]

IT IS FURTHER **ORDERED** that Plaintiff's **Motion to Reinstate R.L.U.I.P.A. Claim** [Docket No. 289; Filed February 17, 2009] is **DENIED**. This claim was dismissed as moot by the former District Judge assigned to this matter. *Order* [#172] at 7. Although Plaintiff contends that the dismissal was "not [sic] final order," he offers no authority for this position, nor does he offer any legal support for resuscitation of this claim.

IT IS FURTHER **ORDERED** that Plaintiff's **Motoin [sic] for Direct Estople [sic] per Doctrine of Res Judicata** [Docket No. 291; Filed February 17, 2009] is **DENIED**. As noted

---

[8] Because I recommend dismissal of Plaintiff's remaining claim on the basis of qualified immunity, it is unnecessary to consider whether Plaintiff has alleged a sufficient physical injury to permit monetary damages pursuant to the PLRA.

earlier, the issue of Defendant's entitlement to qualified immunity was not resolved with finality in resolution of the first motion for summary judgment. Importantly, the Tenth Circuit noted that upon the development of further evidence, the issue of qualified immunity could be reasserted in a later motion for summary judgment or at trial. *Boles*, 487 F.3d at 1183. Plaintiff is mistaken in asserting that he is entitled to rely on the resolution of the first motion for summary judgment. Upon the filing of Defendant's current Motion for Summary Judgment, it was incumbent upon Plaintiff to respond in opposition with supporting evidence.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have ten (10) days after service of the Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives *de novo* review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dept. of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: March 13, 2009

BY THE COURT:

 s/ Kristen L. Mix
U.S. Magistrate Judge
Kristen L. Mix